[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. PROCEDURAL HISTORY
This action was commenced by Plaintiff/Appellants Smith-Groh, Inc. and Pemberwick Apartments LLC as an appeal from a decision of the Appellee Planning and Zoning Commission of the Town of Greenwich denying their applications to amend the Greenwich Building Zone Regulations to allow CT Page 1297-bg greater density for the instant project, and for site plan and special permits. Smith-Groh, the property owner of record, and Pemberwick filed the Application for the amendment to the Building Zone Regulations and for the site plan with special permits on May 11, 2000. The application was to construct a 36-unit apartment building with 9 rent-restricted units pursuant to Section 8-30g of the Connecticut General Statutes on a 1.245 acre lot, on the northwest corner of the intersection of Homestead Lane with Pemberwick Road and West Putnam Avenue in Greenwich, Connecticut. Gateway Park Associates LLC, as the owner of property abutting the premises and located at 777 West Putnam Avenue in Greenwich, Connecticut, opposed the Application at the public hearings of the Commission held on June 20, 2000 and July 11, 2000. Stephen Banker filed a Verified Complaint pursuant to Connecticut General Statutes 22a-19
at the July 11, 2000 Commission hearing. Gateway Park and Banker were added as party defendants to this action pursuant to orders of the Court entered on March 2, 2001.
This is the third application for a special permit and related site plan approval for the property. The appellee Commission had previously approved a plan for 27 apartments for the property in 1989, at the same time as it placed the property in a multi-family residential zone. The original site plan lapsed, but the zone has remained unchanged. A preliminary site plan application of the Plaintiff/Appellants was approved by the Commission on January 7, 1999, which allowed 27 residential apartments, subject to various conditions and modifications to be part of the final special permit and site plan application. The Plaintiff then submitted a final special permit and site plan application for 27 residential apartments. The Commission denied that application, giving as its reasons that (1) the building containing the apartment units was too bulky; and (2) the average amount of square feet in the units was too large. An appeal from the denial of the first application was recently dismissed by the Stamford Superior Court (Mintz, J.).
After the denial of the first application, the Plaintiffs filed a second application in January, 2000 which reduced the average size of the 27 residential units from 672 to 649 square feet, and reduced the height of the building by 10 feet. The Commission's vote resulted in a tie, with two votes to approve the application, two votes to deny it, and one abstention. The two Commission members who voted to deny the application gave two different reasons for their vote: namely, (1) there were no units which were affordable housing; and (2) the building was too large and out of character for the neighborhood. The Plaintiff-Appellants appealed that decision to the Stamford Superior Court. That case has been tried but not decided.
After the denial of the second special permit and site plan CT Page 1297-bh application, the Plaintiff/Appellant filed an affordable housing application for 36 apartment units on the same property. Although there is a 33% increase in the number of proposed units from 27 to 36, the building footprint is no larger than the prior non-affordable housing application. The plan submitted conformed to the zoning regulations for the multi-family apartment zone except for density, setback and floor area ratio. There is public water and sewer available at the site.
When the Commission decided the subject application it took two votes. The first vote concerned the suitability of the location for an affordable housing development. The Commission rejected the site due primarily to the density and amount of open space. The Commission then denied the special permit and site plan, assigning several reasons, which the Appellees contend are on-site traffic circulation problems, off-site traffic safety, a claim of contaminants in some of the fill on the property, and lack of adequate open space.
The Commission's denial of the application on August 1, 2000 was published on August 8, 2000. The case was tried on November 30, 2001. A site inspection was conducted by the Court on December 2, 2001.
II. FACTS
The Court conducted a site inspection on December 2, 2001, at the request of the parties. The Court makes no additional findings upon which it relies as a result of the site inspection, since the facts in the written record adequately reflect the property situation.
The subject Premises is located on a lot containing 1.245 acres. Approximately one-half of the property lies within the flood plain of the Byram River. The south side of the lot touches West Putnam Avenue, but the premises fronts onto Homestead Lane and the intersection with Pemberwick Road. West Putnam Avenue is a divided highway between the New York line and the Pemberwick Road intersection. (Return of Record 91a). All traffic exiting the Pemberwick neighborhood must turn west onto West Putnam Avenue. In order to go towards Greenwich, it is necessary to circle a rotary at the New York State line.
There are no buildings on the premises at the present time. The Plaintiff-Appellant's environmental consultants found arsenic on the property in excess of established regulatory thresholds. (R.54,109b-h). The developer plans to remove the fill during the construction of the building.
In May, 2000 the Plaintiff/Appellant filed an affordable housing application with the Commission under section 8-30g of the General Statutes. The application was for affordable housing in the existing CT Page 1297-bi R-PHD-SU zone with an amendment to the zoning regulations for the zone, and for special permit and site plan approval for 36 apartment units, with 9 units to be designated as affordable housing units for a period of 30 years, as provided under section 8-30g. Although the building containing the 36 proposed units was four stories high, the total height of the building was three feet less than the building approved by the Commission in 1989. The site plan has 72 parking spaces, or 2 per unit, in excess of the standard 1.5 spaces per unit. The building coverage, number of units, floor area ratio, number of bedrooms and other requirements under the proposed amendments are not materially different from the existing zoning regulation. There is public water and sewer available which is adjacent to the property. The Commission denied the Application on August 1, 2000. The legal notice of the denial of the application was published on August 8, 2000. The Plaintiff-Appellants, appealed the denial of the application on August 15, 2000.
III. JURISDICTION
 A. Aggrievement
General Statutes Section 8-8 governs appeals taken from a Planning and Zoning Commission to the Superior Court. A statutory right to appeal may be used only in strict compliance with the statutory provisions by which its created. Testa vs. Waterbury, 55 Conn. App. 264, 268, 738 A.2d 740
(1999). "Pleading and proof of aggrievement are pre-requisites to the trial courts jurisdiction over the subject matter of a Plaintiff's appeal." Jolly vs. Zoning Board of Appeals, 237 Conn. 184, 192, 676 A.2d 831
(1996). "In the case of a decision by a zoning commission an aggrieved person includes any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the board." General Statutes Section 8-8 (a)(1). Pursuant to Connecticut General Statutes Section 8-30g (b) any person whose affordable housing application is denied may appeal such decision pursuant to the procedures of the section. Thus "under Section 8-30g (b) only an affordable housing applicant may initiate an appeal from a decision of a commission." EnsignBickford Realty Corp. vs. Zoning Commission, 245 Conn. 257, 267,715 A.2d 701 (1998). Said section further provides that, except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said Sections 8-8, 8-9, 8-28-8-30 or 8-30a, as applicable. Thus, it is clear that aggrievement must be shown in an affordable housing appeal as the reference to Section 8-8 would indicate. T N Assoicates vs. Town ofNew Milford Planning and Zoning Commission, Superior Court, Judicial District of New Britain, Docket #492236 (November 10, 1999) (Holzberg, J.). CT Page 1297-bj
Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest has been adversely affected. We traditionally have applied the following two part test to determine whether aggrievement exists: (1) does the allegedly aggrieved party have a specific, personal and legal interest in the subject matter of a decision and; (2) has this interest been specially and injuriously affected by the decision. Gladysz vs. Planning and Zoning Commission,256 Conn. 249, 255-56 (2001). The Plaintiff has the burden of pleading and proving aggrievement. McNally vs. Zoning Commission, 255 Conn. 1, 6,621 A.2d 279 (1993).
There is no question that Smith-Groh, Inc., as the owner of the property (Warranty Deed to Smith-Groh, Inc. dated September 3, 1999, Appellants trial exhibit 1) is an aggrieved party. Winchester WoodsAssociates vs. Planning and Zoning Commission, 219 Conn. 303, 308, (1999), Bossert Corporation vs. City of Norwalk, 157 Conn. 279, 285
(1968). Pemberwick Apartments, LLC claims that it is the contract purchaser of the property and thus, has a sufficient interest in the zoning decision to have standing to take an appeal. RR Pool and Homevs. Zoning Board of Appeals, 43 Conn. App. 563, 570 (1996); Shapero vs.Zoning Board, 192 Conn. 367, 376 1984). Certainly, if proven to the Court's satisfaction, the contract purchaser of property that is subject to the application has standing to appeal a decision on the application. Id. at pp. 376-377. However, the determination of aggrievement presents a question of fact for the trial court. McNally vs. Zoning Commission,225 Conn. 1, 7, 621 A.2d 279 (1993).
Pemberwick claims to have a specific, personal and legal interest in the development of the subject Premises. During the trial there was testimony to the effect that Pemberwick has a contract to develop or co-develop the subject Premises with Smith-Groh. Pemberwick has not, however, provided this court with any written contract demonstrating its interest in the property. Instead, it relies upon the oral testimony of the presence of the contract it purportedly has with Smith-Groh to develop the subject premises. Other than the evidence in the record to the effect that Pemberwick was the applicant to the Commission, this court has no competent evidence from which it can deduce the nature of Pemberwick's interest, if any, in the subject premises. This Court finds Pemberwick's interest in the premises to be unspecific and vague. The subject of aggrievement is not a matter of guesswork or conjecture for the Court. If there is a written contract between the parties, it should have been produced at trial. The Court finds that Pemberwick has failed to meet its burden of proof for the first prong of the test for aggrievement, in that it has not displayed that is has a specific, personal and legal interest in the subject matter of the decision. Further, it has failed to show that it has the requisite interest in the CT Page 1297-bk subject matter of the Commission's decision, and that any loss sustained by Pemberwick, financial or otherwise, has the demonstrated nexus to the decision. Accordingly, this Court finds that Pemberwick has failed to prove the issue of aggrievement and dismisses the appeal as to Pemberwick. However, since this Court has found that Smith-Groh is aggrieved, the Court has jurisdiction of the appeal and may decide the merits of the case. Only one Plaintiff/Appellant must prove aggrievement in order for the court to decide the merits of the case. ProtectHamden/North Haven vs. Planning and Zoning Commission, 220 Conn. 527, 529
n. 3, 600 A.2d 757 (1991).
B. Timeliness and Service of Process
 Pursuant to Connecticut General Statutes Section 8-8 (b), as amended by Public Act No. 01-47, an appeal shall be commenced by service of process within fifteen days from the date that the Commission's Notice of Decision is published. Further, it shall be commenced by leaving the process with, or at the abode of the Clerk or Chairman of the Commission, and with the Clerk of the municipality. See General Statutes Section 8-8 (f), as amended by Public Act No. 01-047. Smith-Groh served process on August 15, 2000 on the Assistant Town Clerk for the Town of Greenwich and at the usual place of abode of the Chairman of the Planning and Zoning Commission for the Town of Greenwich. The legal notice of denial of the application was published on August 8, 2000. This appeal, therefore, is timely and the proper parties were served, pursuant to Connecticut General Statutes Sec. 8-8 (e), and 8-30 (g). For appeals brought pursuant to Connecticut General Statutes Section 8-8 and, hence, Section 8-30g, the citation is analogous to the writ used to commence a civil action and directs a proper officer to summon the agency whose decision is being appealed. Tolly vs. Department of Human Resources, 225 Conn. 13, 18-19, 621 A.2d 719
(1993). The file contains a proper citation.
IV. SCOPE OF JUDICIAL REVIEW
At the time the instant appeal was filed on August 15, 2000, General Statutes (Rev. to 1999) Section 8-30g was in effect and provided, in relevant part: (1) As used in this section: (1) Affordable housing development means a proposed housing development which is (A) assisted housing, or (B) in which not less than twenty-five per cent of the dwelling units will be conveyed by deeds containing covenants or CT Page 1297-bl restrictions which shall require that such dwelling units be sold or rented at or below price which will preserve the units affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income or eighty per cent of the state median income, whichever is less, for at least thirty years after the initial occupation of proposed development; (2) Affordable housing application means any application made to a commission in connection with an affordable housing development by a person who proposed to develop such affordable housing; (3) Assisted housing, means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under Chapter 319 or Section 1437 of Title 42 of the United States Code. (B) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development . . . may appeal such decision pursuant to the procedures of the section. (C) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reason cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development . . . If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it . . . (E) following a decision by a commission to reject an affordable housing application . . . the applicant may, within the period for filing an appeal of such decisions, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall stay the period for filing an appeal from the decision of the commission of the original application . . .
Connecticut General Statutes (rev. to 1999) Section 8-39a provides that "affordable housing means housing for which persons and families pay thirty percent or less of their annual income, where such income is less than or equal to the area median income for the municipality in which such housing is located, as determined by the United States Department of housing and Urban Development."
The scope of judicial review of a planning and zoning commission's CT Page 1297-bm decision in an application brought under Connecticut General Statutes Section 8-30g was changed by the Connecticut Supreme Court's July 17, 2001 decision in Quarry Knoll II Corporation et al. vs. Planning andZoning Commission of the Town of Greenwich et al., 256 Conn. 674 (2001). Prior to the Quarry Knoll decision, the Supreme Court held in ChristianActivities Council, Congregational vs. Town Council of Town ofGlastonbury, 249 Conn. 566, 583 (1999), that a commission had the burden on such an appeal to marshal the record evidence to support its decision and to persuade the reviewing court that there was sufficient evidence in the record to support the reasons given, in a "formal, official, collective statement", for its decision under Connecticut General Statutes Section 8-30g (c)(1). If "sufficient evidence" in the record was demonstrated reasonably to support the Commission's determination as to all four parts of the standards for any one of the reasons given for its decision, the commission's decision had to be upheld. ChristianActivities Council, Congregational vs. Town Council of the Town ofGlastonbury, Id. at pp. 583, 589-92 (1999).
In Quarry Knoll, the Court analyzed the effect of Public Act 00-206 Section 1(g) (which took effect on October 1, 2000, after the instant Commission Action) upon the scope of judicial review. It determined that the Act clarified the statutory standard and could, therefore, be applied retroactively. While a commission's collective reasons for denying an affordable housing application are still to be upheld under CGS Section8-30g (c)(1)(A) if there is "sufficient record evidence" to support them, the scope of judicial review under Subsections (B)(C) and (D) of the same statute has been changed by the Quarry Knoll Court.
The Quarry Knoll Court, at pp. 726-27, described a two-step judicial review process for each reason articulated for a commission's decision:
 In summary, we conclude, on the basis of our review of the legislative history, that P.A. 00-206, Section 1(g), was intended to clarify the original intent of Section 8-30g (c), namely, that there are two standards of judicial review under Section 8-30g (c)(1)(A) through (D). We begin by noting the established rule that "as in a typical zoning appeal, the court's function in an appeal under Section 8-30g (c) is to review the record made in the zoning proceeding." Christian Activities Council, supra 249 Conn. 582
(1999). Under Section 8-30g (c)(1)(A), the court must determine, as we had prior to the enactment of P.A. 00-206, Sectional I(g), whether the commission has shown that its decision is supported by "sufficient evidence" in the record. Under subparagraphs (B), (C) CT Page 1297-bn and (D) of the statute however, the court must review the commission's decision independently, based upon its own scrupulous examination of the record. Therefore, the proper scope of review regarding whether the commission has sustained its burden of proof, namely that: its decision is based upon the protection of some substantial public interest; the public interest clearly outweighs the need for affordable housing; and there are no modifications that reasonably can be made to the application that would permit the application to be granted — requires the court, not to ascertain whether the commission s decision is supported by sufficient evidence, but to conduct a plenary review of the record in order to make an independent determination on this issue. Cf. State vs. Pinder, 250 Conn. 385, 409-12, 736 A.2d 857 (1999).
The difference between the Christian Activities Council and QuarryKnoll review processes is that for the three-part statutory standard of Subsections (B), (C) and (D) to which each commission reason is held, theChristian Activities Council Court gave deference to the commission's determination, so long as it was supported by "sufficient evidence" in the record; while under Quarry Knoll, the reviewing court makes a scrupulous, plenary review of the record and arrives at its own independent determination of whether the commission's reasons to deny an application meet the three-part test.
When the trial court reviews the Commission's decision it only considers the collective reasons stated by the agency. Kaufman vs. ZoningCommission, 232 Conn. 122, 142 (1995). This requires the Commission to state its reasons on the record in the form of a formal, official collective statement, and the agency must give all its reasons for a denial, because only those reasons will be considered on appeal.Christian Activities Council, Congregational vs. Town Council of Town ofGlastonbury, Supra at pp. 594, 595 (1999). The Commission's collective reasons are those stated by the Commission at the decision making session. The reasons must be the collective reasons given when the agency voted on the application. Mackowski vs. Planning and Zoning Commission,59 Conn. App. 608, 615 (2000). With affordable housing applications, the same as conventional zoning applications, the trial court considers only the collective reasons assigned by the agency, and not the reason of individual agency members. Schwartz vs. Town Planning and ZoningCommission, 159 Conn. 534, 541 (1970). The reasons for the denial of the application must relate to the stated public interests to be protected.Town Close Associates vs. Planning and Zoning Commission, 42 Conn. App. 94, CT Page 1297-bo 98 (1996). If any of the reasons actually assigned by the Commission are not supported by sufficient evidence, they are not considered. Further, if the Commission meets the initial burden of proof that there is sufficient evidence in the Record to support a reason for denial, the trial court then considers the three other statutory requisites namely, the decision is necessary to protect a substantial public interest in health, safety or other matters which the Commission may legally consider; that such public interests clearly outweigh the need for affordable housing, and that such public interest cannot be protected by reasonable changes to the affordable housing development. As determined by Quarry Knoll, the Commission has the burden of proof on all of these issues. Moreover, the trial court engages in a plenary review and makes its own independent determination whether the Commission has satisfied its burden of proof on these factors Id. at pp. 727, 735.
In order to prove that the Commission's decision was necessary to protect substantial public interests in health, safety or other matters which the commission could legally consider it must establish (1) that it reasonably could have concluded that substantial public interests were implicated by the action based upon the evidence in the administrative Record, and (2) that it could reasonably have concluded from the Record evidence that its decision was necessary, namely that any public interests could not have been protected if it had approved the application, which is more than a mere possibility that granting the application would harm the public interests. Christian ActivitiesCouncil, Congregational vs. Town Council, 249 Conn. at pp. 588-589
(1999). The burden of proof on the Commission that such public interests clearly outweigh the need for affordable housing has similar considerations Id. at pp. 590-592. The need for affordable housing is determined on a local and not a regional basis. Id. at pp. 598. Greenwich fits under the statute since its rate of affordable housing is under 5%, well below the suggested 10% imposed by statute. In order to meet the burden of proof that the public interests cannot be protected by reasonable changes to the affordable housing development, the Commission has the burden of proof that the public interests could not be protected by reasonable changes to the size and density of the zone, or to the specified designs presented by the applicant. Kaufman vs. ZoningCommission, 232 Conn. at 137 (1995).
V. DISCUSSION
 A. Proposed Zoning Amendment
The purpose and statutory scheme of the affordable housing statute, Section 8-30g, is to allow affordable housing whether or not it is otherwise permitted under the zoning regulations. Provided the statute is CT Page 1297-bp followed as to the requirements for affordable housing, and the specific site for which it is proposed is suitable for that purpose, the underlying zoning of the property makes no difference. An affordable housing application can be approved even though it does not comply with the existing zoning regulations for the zone in which it proposed because Section 8-30g supercedes the usual zoning standards. Wisniowski vs.Planning Commission, 37 Conn. App. 303, 315, 318 (1995). Although not specifically required, the plaintiff/appellant's attorney submitted an amendment to the zoning regulations for the residential planned housing-small unit zone (R-PHD-SU) Sections 6-62 to 6-74, Greenwich Building Zone Regulations. The subject property has been in that zone since 1988. The only principal permitted use in the zone is multi-family dwellings. Section 6-70. The existing regulations contain provisions for the minimum lot area for each type of unit floor area and setbacks. The submitted amendment proposed an additional section 6-71.1, providing for and containing standards for affordable housing units only for that zone. The reasons stated by the Commission for the denial of said change were the increased density that would result in the zone, additional lot coverage, and adverse traffic at the site. However, the adverse traffic reason is directed to the development of the specific site, which is not germane to a general zoning amendment for properties in the small apartment zone.
The amount of affordable housing in Greenwich is 4.8% of the total housing units, and only 14 units haven been added since 1987 (Exhibit ID). The amendment to add Section 6-71.2 to the Zoning Regulations only affects the R-PHD-SU Zone. There are only six parcels of land in Greenwich in the small apartment zone, including the subject property, which is the only parcel which has not been developed. The other five parcels are basically located along the Post Road and contain 360 units. Since the other properties have been developed, mostly as condominiums, there is limited potential to develop them further. Commission member Stone stated that they would support another 90 units, which would put a burden on the entire Town's infra-structure, school system, and services. (Exhibit 86, page 8). It has been held that this is not a valid reason for denying a zoning application. Beach vs. Planning and ZoningCommission, 141 Conn. 798, 84 (1954). Stone also stated: "This can't go into your minutes, Mr. Reporter, but if we dealt only with those that exist and increase the number of units; you can see what it would do, to the town's population and all depend on it." (EX. 86 pg. 8). Stopping development and keeping additional residents out of the Town is also not a legitimate zoning objective. Kavenewsky vs. Zoning Board of Appeals,160 Conn. 397, 407 (1971). It is certainly not a valid reason for denying a zoning amendment providing more affordable housing, particularly where the Town is significantly under the 10% minimum goal in Section 8-30g of the Connecticut General Statutes. The statute applies to zone changes, CT Page 1297-bq and therefore to changes in zoning regulations, and a change to multi-family use can be ordered by the trial court in appropriate cases.West Hartford Interfaith Coalition, Inc. vs. Town Council, 228 Conn. 498,509-512 (1994); Kaufman vs. Zoning Commission, 232 Conn. 122, 133, 134
(1995). In view of Greenwich's performance in the affordable housing area in the last fifteen years, this case certainly meets that criteria.
The Commission also discussed the effect of the change in zoning setbacks as a reason for not approving the amendment, claiming that by increasing the density by 25% in the small apartment zone, the setbacks could be reduced by a much as 60% (Exhibit 86, page 12). The existing regulation for the small apartment zone states that the zoning setbacks for front side and rear yards shall not be less than 10 feet per story, but in no event less than 20 feet. Section 6-68, Zoning Regulations (Ex. 105). The maximum building height provision in Section 6-66, which remains unchanged is four stories or 40 feet. The proposed amendment (Exhibit 1) states that front, side and rear yards shall not be less than 7.5 feet per story, but in no event less than 20 feet. Under the current and proposed regulations there would be at least a 20 foot setback on all sides of the property. A four story building, which was the proposal in the instant appeal, would have to be at least 30 feet from the property line, which is exactly the same as a three story building under the existing regulations. Accordingly, the reason cited for the Commission's denial of the amendment is not supported by sufficient evidence in the Record. Assuming, arguendo, that the Commission met its initial burden of proof, its discussion does not establish that denial of an amendment is necessary to protect substantial public interests in health, safety or other legitimate objectives, or that any such public interest clearly outweighs the need for affordable housing. An increase in density on parcels in the zone and minor changes in the setback is minimal, when compared with the need for affordable housing. The maximum floor area for each type of building under Section 6-64 (c) of the existing regulations remains unchanged; and it provides for 450 square feet for a one room efficiency unit, 650 square feet one bedroom and 850 square feet for a two bedroom unit. The increase in the number of units per acre under the amendment increases from 24.2 units per acre to 32.26 units. Even if these were all one bedroom apartments, it would only result in a maximum increase of 5,200 square feet, or 1,300 square feet in a four story building. Five additional two bedroom units per acre is only an increase of 4,250 square feet or less than 1/10 of an acre even if located only on one floor. The Court finds that the Commission did not have sufficient evidence to deny the zoning amendment.
B. Traffic Considerations Related to On-Site Traffic
A Zoning Commission does not have to make its findings in perfect CT Page 1297-br language. Couch vs. Zoning Commission, 141 Conn. 349, 358, 359 (1954). However, the reasons given for the denial of an affordable housing application must be the collective reasons cited by the zoning agency at the time it took its formal vote on the application, rather than reasons that later might be culled from the Record. Mackowski vs. Planning andZoning Commission, 59 Conn. App. 608, 615 (2000). Defendant-appellees rely upon reasons stated in a denial letter dated August 15, 2000, seven days after publication of the notice of denial issued on August 8. A Zoning agency cannot reconsider its decision after it has been published, because it no longer has jurisdiction over the application.Sharp vs. Zoning Board of Appeals, 43 Conn. App. 512, 526 (1996). The letter issued by the Town Planner on August 15 does contain reasons which were not discussed at the time when the vote was taken by the Commission. This Court will only consider the collective reasons of the agency given in its decision making session (Ex. 86) pursuant to the dictates of the Mackowski decision. A reading of the transcript of the agency's decision making session evinces an overwhelming concern on the part of the commission with the density of the project. There is reference to the safety impact of the increased traffic off-site at a rotary some 200 feet away. There is reference by one member to open space. Another member mentioned contamination at the site. There was also discussion about an unsafe traffic condition due to the density of the project and negative impact on the quality of life in the neighborhood. One member had a concern about the ability of safety vehicles to get in and out of the project. While there is not agreement on the specific reasons for the denial, the parties have concentrated on four specific reasons, namely (1) on-site traffic safety problems; (2) off-site traffic safety; (3) contaminates in the fill on the subject property; and (4) adequacy of the amount of open space on the property.
The Commission's concern with on-site traffic problems appears to be minimal. One member expressed a concern that absent a survey by the Greenwich Emergency Medical Service she was not sure if the project could adequately handle emergency vehicles. She also indicated that the Town's Traffic Engineer had a concern about the maneuverability in the parking lot for trucks, and that they might park on the street and block traffic.
The application in the instant appeal does not concern the layout of new streets. Homestead Lane is an existing public road. There is no evidence in the record of accidents at the location of the entrance to the property, or even at the intersection of Pemberwick Road and Homestead Lane.
The Town's traffic engineer, after review of the plan, made only two comments. In his initial letter dated February 11, 2000 (Ex. 20), he indicated that the applicant must identify on-site refuse collection CT Page 1297-bs accessibility and widen the driveway from 22 feet to 24 feet. The entrance adjacent to the site was widened as requested on a revised plan. The applicants traffic consultant also checked the turning radius for large trucks entering the property and determined that a truck with a travel path that starts at the driveway center line and turns leaving the driveway does not encroach over the center line for Homestead Lane and could obtain access to the site. (Exhibits 1d, 60 and 61). In a subsequent letter dated June 19, 2000 the traffic engineer expressed concerns about the turning movement of a SU-30 vehicle turning right, access to the dumpster, large moving vans, and a plan for catch basins. Applicants argue that the widening of the driveway to 24 feet solved the turning radius problem as per the sketch of their engineer, and a letter from the sanitation company indicated that it would have clear access to the dumpsters. (Ex. 40). Exhibit 40 also indicated that only a small moving van would be required for the relatively small one and two bedroom apartments in the project. Further, a restriction would be placed on all leases prohibiting large semi-trailer trucks from being used for the tenant relocations. The requirement of a plan indicating curb cuts, catch basin, utility poles and the edge of the roadway for the east and west sides of Homestead Lane, within 200 feet of the driveway can be done prior to obtaining the building permit, and was not a concern to the commission.
One commission member questioned the access to the premises by emergency vehicles. The fire marshal indicated that if the entire building is sprinkled, northern access is not an issue. (Ex. 40). In view of the fact that the building is to have sprinklers, this does not appear to be a legitimate concern.
The Defendant/Appellees have failed to meet their burden of proof with regard to the issue of on-site traffic problems. There is not sufficient evidence in the record to support this decision. It should also be noted with regard to the overall general concern of the Commission that a general concern about density, without specific evidence of the impact of that increased density, is not sufficient to deny and affordable housing application. If a Planning and Zoning Commission were allowed to deny any affordable housing application because the application exceeded the density regulation in the specific area of the town, it could undermine the very important objective of affordable housing. Under the Planning and Zoning Commission's proposed interpretation, a town could utilize zoning to impede a developer from appealing under the statute. WestHartford Interfaith Coalition vs. Town Council, 228 Conn. 511 (1994).
C. Off-Site Traffic Problems
The Commission had expressed concerns about the increased traffic at a CT Page 1297-bt rotary some 200 feet away from the site. The applicants traffic study indicated that excellent levels of service will prevail on Homestead Lane, Pemberwick Road and West Putnam Avenue (Rte. 1). The right turns onto Route 1 will operate at an excellent level of service. The report further states that there are good sight lines from the entrance drive looking both north and south, and that the 20 a.m. trips and the 23 peak trips estimated will not affect the operating conditions of the level of service at either of the two nearby intersections. (Ex. 1). The Defendant/Appellee's traffic engineer had some concerns about traffic issues, related to meeting the minimum criteria for design standards in Greenwich. The level of service for vehicles making a left hand turn onto Pemberwick and Homestead was at minimally acceptable levels during rush hours. In evaluating the applicant's traffic study, the opponents consultant stated: "In general, we find that the Bark and Mess traffic study report is professionally prepared and covers the necessary elements of a site traffic impact study. It describes existing conditions, background traffic growth, project traffic generation, distribution and assignment, site access, and overall traffic impact. The report's basic conclusion that the added vehicle traffic from the proposed development will not significantly affect the traffic operations to nearby roadways is reasonable based on the size and nature of the proposed project."
There is no problem with vehicles leaving the project site. The Pemberwick Road/Homestead Lane intersection has no accident history. (Ex. 79, p. 3). The intersection of West Putnam Avenue (Rte. 1) and Pemberwick Road is a divided highway, with two lanes in each direction. Accordingly, traffic leaving Pemberwick Road must make a right turn onto West Putnam Avenue, headed toward the New York State Line. At that location the traffic report indicates level of service A, which means no traffic delays, and the best level of service.
In order to enter Pemberwick Road or Homestead Lane, cars proceeding westbound on West Putnam Avenue simply make a right turn into Pemberwick Road. There is no indication of any accidents from this traffic movement. Vehicles proceeding eastbound on West Putnam Avenue must cross the westbound lane in order to enter Pemberwick Road. There is a left turn onto Pemberwick Road. During the afternoon peak hour the level of service is rated at E which indicates a delay of 30 to 45 seconds. This is considered an acceptable, if not an optimum, delay. The project, when completed, will generate 17 vehicle trips during the afternoon peak hour (Ex. 1 p. 7). That report also concluded that there were tolerable operations for the left turn into Pemberwick Road and that the intersection would not be impacted with a small amount of added traffic, and the level of service would not change (Ex. 1 pg. 7).
The rotary mentioned by the Commission member is in New York, and is CT Page 1297-bu located about 500 feet from Pemberwick Road. Traffic proceeding around the rotary and back in an eastbound direction on West Putnam Avenue passes an intersection with a street known as Byram Road. The Byram Road-West Putnam road intersection cannot be reached directly from the property, but is at least one-fifth mile away. The traffic engineers agreed that the project would not have any effect upon the traffic condition on West Putnam Avenue. While there have been accidents at the Byram Road intersection, it is no more dangerous for vehicles entering or leaving the subject property, than for any of the other thousands of vehicles that use West Putnam Avenue every day. While some of the vehicles from the project will obviously travel in the direction mentioned, any conclusion that this project presents an added traffic hazard on the Post Road in the area mentioned is specious. Likewise, the fact that there have only been four accidents at the Pemberwick Road and West Putnam Avenue intersection which only resulted in property damage, also does not justify the Defendant-Appellees position with regard to off-site traffic. The Defendant-Appellees have failed to meet their burden of proof with regard to the issue of off-site traffic.
D. Contaminated Fill
The Defendant-Appellees contend that the Commission properly denied the application because of a contaminated fill pile in the Byram River flood plain, and claim that this reason is supported in pages 24, 26-29 of the transcript (Ex. 86). Although the property is in the 100 year flood plain for the Byram river, the Greenwich Inland Wetlands and Watercourses agency approved an application and considered the nature of the fill on the site and the potential danger of any contaminates. (Ex. 58, Item C). Only one Commission member raised a question of contaminates, and she did not raise any specific information as to why it might be a problem. There was no evidence of groundwater contamination.
The only suggestion in the record of any potentially dangerous contaminants was the presence of arsenic at separate test levels of 11.3, 18.9 and 8 parts per million. The Connecticut Department of Environmental Protection Residential Standard of Direct Exposure for arsenic is 10 parts per million. (Ex. 109). This means direct contact with the substance. Additional tests were performed at four different locations on the property, which disclosed arsenic levels of 7.79, 5.60, 13.3 and 8.78 parts per million. Only one of these tests exceeded the state standard for direct contact.
The plans for the development of the property include excavation for the building, which would remove the soil containing the small amounts of arsenic. The applicant's environmental consultant recommended excavation of an additional two feet below the previous plans, prior to the CT Page 1297-bv implementation of construction activities. (Ex. 52). The consultant indicated that the excavation of an additional two feet from the subject site is acceptable, if not preferable to satisfy environmental concerns. Results of samples collected from these greater depths indicated the presence of contaminates at a concentration level below applicable Connecticut Department of Environmental Protection Standard Regulation (Ex. 52). Another environmental analyst reviewed drainage through the soil with the Town's Zoning enforcement officer. He suggested that suitable hydrologic fill be placed below the infiltrator gallery and basins, with the use of boulders from the existing file on the site. (Ex. 55, Ex. 90).
There is no sufficient evidence in the record to establish that the small amounts of arsenic on the property pose any threat to the public or to the Byram River. The excavation for the building will remove soil containing arsenic; it has not been shown that the project approved will have an affect upon the public health and safety. Defendant-Appellee's have failed to meet their burden of proof with regard to the contaminants issue.
E. Open Space
During the discussion on the proposed amendment on the zoning regulations, the commission members noted some change in the setbacks which could reduce the amount of grass and open areas on the property. (Ex. 86 pp. 11-14). One Commission member also briefly commented that preserving and enhancing important open space is a consideration, and that there would be a loss of some of the green space surrounding the building (p. 38).
The subject property, even without the change in the zoning regulations, is located in a zone where the only permitted use is multi-family dwellings. Section 6-70 Greenwich Building Zone Regulations. The 36 unit plan is created by adding a floor to the previous 27 unit plan. The building footprint is the same size as the prior applications. There is a reduction of about 800 square feet of grass on 1.245 acre lot. The consideration of open space would certainly have more impact upon a larger tract rather that the relatively small tract of land in the instant appeal which is already zoned for multi-family usage. The Defendant-Appellees have not met their burden of proof in this regard. There is insufficient evidence in the record to justify a denial on the basis of open space.
The Court has ruled that the four reasons asserted by the Defendant-Appellees are not supported by sufficient evidence in the record. The Defendant-Appellees have failed to meet their burden of proof CT Page 1297-bw with regard to these reasons. Even assuming, arguendo, that any one of the reasons was sufficient, which it was not, the facts submitted to this Court would not have survived the plenary review suggested by the QuarryKnoll Court. The need for public housing in Greenwich is so great, and the Town's efforts to improve the situation over the past fifteen years so minimal, that the affordable housing interest would have outweighed any argument to the contrary based upon the facts which were considered by this Court.
VI. CONCLUSION
The appeal is dismissed as to Pemberwick Apartments, LLC for its failure to prove aggrievement. The actual reasons assigned by the Commission for denying the application are not supported by sufficient evidence in the Record. Even if any reason were supported in the record, the Commission has not met its burden of proof pursuant to Section8-30 (g)(1) of the General Statutes and the Quarry Knoll decision. The appeal of Smith-Groh, Inc. is hereby sustained and the Commission is directed to approve both the proposed amendment to the zoning regulations and the instant affordable housing application.
THE COURT
Eveleigh, J.